# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

**FILED**
MAY 11 2018
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST LOUIS

In the Matter of the Search of )
A Motorola Moto, Cell Phone IMEI: 355674083208499, hereinafter "Cell Phone A," which is currently in the possession of the St. Louis County Police Department, 7900 Forsyth Blvd Clayton, MO 63105 )
)  Case No.  4:18 MJ 5166 NAB
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Jared Queen, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the ___EASTERN___ District of ___MISSOURI___, there is now concealed

SEE ATTACHMENT A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§1591(a) and 2, and 1952(a)(3) | Sex Trafficking And Use Of Interstate Facilities To Facilitate Prostitution |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*  DET. JQ 543A

Jared Queen, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 11, 2018

*Judge's signature*

City and state: St. Louis, MO

Honorable Nannette A. Baker, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jennifer A. Winfield

FILED
MAY 11 2018
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST LOUIS

## AFFIDAVIT

I, Jared Queen, being duly sworn, do hereby depose and state:

### I. INTRODUCTION

1. I am a Detective with the St. Charles County Police Department. I have been employed as a Police Officer for approximately 8 years and am currently assigned as a Detective detached to the Division of Criminal Investigations, Special Investigations Unit of the St. Louis County Police Department. I am also a Special Federal Officer assigned the FBI's Human Trafficking Task force. I have been a Special Federal Officer for approximately two (2) years, and a police officer with the St. Charles County Police Department for eight (8) years. I have worked a variety of investigations to include prostitution, promoting prostitution, sex trafficking, sex trafficking of a child, possession of child pornography and production of child pornography. During my time as case agent on numerous complex investigations, I utilized a variety of investigative techniques to include: organizing and participating in physical surveillance; participating in undercover operations; serving search warrants; making arrests; and interviews involving trafficking defendants. As part of my duties as a Special Federal Officer with the FBI, I investigate crimes involving sex trafficking and child pornography, including violations of Title 18, United States Code, Section 1591 (sex trafficking by force, fraud, or coercion); Title 18, United States Code, Sections 2422(a) and 2422(b) (coercion and enticement to engage in prostitution); Title 18, United States Code, Sections 2251(a) and 2251(e) (production and attempted production of child pornography). I have received specialized training in the area of sex trafficking, and have participated in investigations of persons suspected of violating federal sex trafficking laws, including Title 18, United States Code, Sections 1591, 1952, 2422(a), 2422(b).

2. This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits, and evidence of a violation of in violation of Title 18, United States Code §§1591(a) and 2 (sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense), and §1952 (use of interstate facilities to promote, manage or facilitate prostitution). The evidence of these violations will be found in the following item that is the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment A.

3. The item to be searched, which consists of:

    (a) a Motorola Moto, Cell Phone IMEI: 355674083208499, hereinafter "**Cell Phone A**," which is currently in the possession of the St. Louis County Police Department, 7900 Forsyth Blvd Clayton, MO 63105.

4. The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and other persons. In the course of preparing this affidavit and conducting the present investigation, I have consulted with agents and investigators with specialized training and experience in digital evidence and forensics. The information in this affidavit is submitted for the limited

purpose of establishing probable cause in connection with the present application and is not intended as a complete statement of all facts related to the present investigation.

## II. DEFINITIONS

5. The following terms have the indicated meaning in this affidavit:

   a. The phrase "records, documents, and materials" as used herein, including those used to facilitate communications, includes all of the listed items of evidence in whatever form and by whatever means such records, documents, or materials may have been created or stored. Those forms and means of storage and creation include but are not limited to any handmade from (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, motion pictures, photocopies); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, and CD-ROMS), as well as printouts or readouts from any magnetic storage device.

   b. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   c. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device) Cellular telephones or any other mobile device.

   d. Electronic data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.

e.  "Wireless telephone or mobile telephone, or cellular telephone'" as used herein means is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

### III.   CONSIDERATIONS REGARDING DIGITAL EVIDENCE

6.  Digital and electronic files may be important to criminal investigations in several ways. In some cases, the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime. Further, the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in various forms of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

7.  As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

### CELLULAR AND MOBILE PHONES

8.  As used herein, a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

9.  In addition to enabling voice communications, typically, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: receiving and storing voice mail messages, storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

10. An "iPhone" is a brand of handheld wireless electronic communications devices made by Apple Inc. Apple cellular phones generally enable users to send email, make and receive telephone calls, access the Internet, and organize appointments and contact information. iPhones can also send instant messages, take digital pictures or moving video, or store and play digital music or video files. iPhones may also contain GPS technology for determining the location of the device.

## IV. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND/OR CELLULAR PHONES

11. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

    a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he/she often stores it in random order and with deceptive file names. The latter requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

    b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Moreover, the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As such, it is difficult to know prior to a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

4

## V. SEARCH METHODOLOGY TO BE EMPLOYED

12. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (NOTE: The following is a non-exclusive list, as other search procedures may be employed):

    a. Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as listed in Attachment A;

    b. Searching for and attempting to recover any deleted, hidden, and/or encrypted data to determine whether that data falls within the list of items to be seized as listed in Attachment A (any data that is encrypted and/or unreadable will be returned when law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c. Surveying various file directories and the individual files they contain;

    d. Opening files in order to determine their contents;

    e. Scanning storage areas;

    f. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

    f. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

    g. I am requesting permission to have the analysis of the data done in the ordinary course of business of the agency that is performing the forensic analysis.

    h. To obtain the data from the cell phone/mobile devices contained within this warrant utilizing a range of data analysis techniques. However, in some extreme cases, the cell phone may be damaged beyond repair, password locked or otherwise inoperable causing traditional data analysis techniques not to work. In these cases, you are granted permission to use an analysis technique referred to as "chip-off". "Chip-off" is a process where the BGA (Ball Grid Array or memory chip) is removed from the cell phone to allow the chip itself to be analyzed. This process renders the cell phone unusable, but preserves the actual content."

5

## VI. COMMERCIAL SEX TRADE AND THE USE OF CELLULAR PHONES

13. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

    a. I have investigated matters involving a violation of Title 18, United States Code, §§ 1591 and 1952. I have been trained regarding the investigation of these types of crime in which computers and cellular phones are used as a means for receiving, transmitting, and communicating in efforts to exploit victims, as well as services related to human-trafficking, which would include prostitution and other coerced commercial sex services.

    b. The development of computers, digital cameras, cellular telephones and the Internet has changed the way in which individuals involved in human-trafficking/prostitution interact with each other. Computers and storage devices for electronic media, cameras and cellular phones serve various functions in connection with human-trafficking/prostitution. They include: (1) advertisement (e.g., via Craigslist.com or Backpage.com); (2) communication (via email, Internet social media, cellular telephone or text) and (3) storage (pictures/images, electronic communications stored on computers, digital cameras and cellular telephones).

    c. Human traffickers and "pimps" can now store information and photographs related to their business enterprises on electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMS and DVDs as well as printouts or readouts from any magnetic storage device.

    d. Human traffickers and "pimps" can now transfer photographs directly to and from a computer. A device known as a modem permits a computer to connect to other computers through the use of telephone, cable, or wireless connection. Electronic contact can be made to millions of computers around the world. A "pimp" is a term typically used in reference to a man (sometimes a woman), who solicits customers for a prostitute or a brothel, usually in return for a share or all of the earnings that the prostitute makes.

    e. The computer's ability to store images (and other electronic data, i.e. emails and other forms of communication) in digital form makes the computer itself an ideal repository for human traffickers and individuals promoting prostitution. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of pieces of information and images at a very high resolution.

6

 f. The Internet affords individuals interested in human-trafficking/prostitution several different venues for viewing advertisements and communicating relatively anonymously in search for services.

 g. Organizers (like pimps) of human-trafficking/prostitution also utilize online resources to send and receive communications via services offered by Internet portals such as Yahoo and Hotmail, among others, and social media networking websites like Instagram, Twitter and Tagged.com. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of human-trafficking/prostitution can be found on the user's computer(s). Access to the services can also be done from a cellular telephone (i.e., smart phone, iPhone, etc.).

 h. As is the case with most digital technology, communications by way of computer or cellular telephone can be saved or stored on either device which is used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites such as "bookmarked" or "favorite" files. Digital information can also be retained unintentionally, such as traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or internet Service Provider client software, among others). In addition to electronic communications, a computer (and cellular telephone) user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence that shows that a computer contains specific software; when the software was installed; logs regarding the usage of the software; and even some of the files which were uploaded or downloaded using the software. Such information may be maintained indefinitely until overwritten by other data.

 i. Organizers (like pimps) of human-trafficking/prostitution also utilize multiple cellular phones and/or computer devices in order to (1) communicate with their commercial sex workers (prostitutes), (2) facilitate commercial sex dates, (3) to avoid detection by law enforcement and (4) to communicate with potential customers in the commercial sex trade.

 j. Human traffickers and pimps use digital cameras, digital video recorders and related media to take pictures and videos of their prostitutes. I further know that this is done for several reasons. Pimps post video and photographs to the Internet as a means of advertising their prostitutes. I further know that pimps are "collectors" and will retain these images and video as souvenirs. Pimps

7

        also will manufacture pornographic or sexually explicit videos and photos to satisfy their prurient interest.

14. Based upon my training and experience, the training and experience of other investigators with whom I have communicated, and police reports I have reviewed, electronic communication devices (cell phones, PDAs, computers, etc.) are permanently possessed by individuals involved in the commercial sex trade much the same way a legitimate business will use tools of its trade whether or not the business has a particular item in inventory on a given date. These items are kept by individuals involved in the commercial sex trade whether or not they are involved in or arranging for a criminal act at any given moment. I believe that the seizure of such items will provide evidence of the events set forth in this affidavit and that such files can be found within electronic devices described in Attachment A despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

## VII. BACKGROUND INVESTIGATION AND PROBABLE CAUSE

15. On March 5, 2018, Darry Williams, Jr. ("Williams") via "Badoo," a social media platform, contacted "Jane Doe." "Badoo" is a social media platform that allows a user to create an online profile and chat with other users via cell phone application or web browser. On its website, "Badoo" refers to itself as a "dating-focused social network …with offices in London, Malta, Moscow and the U.S."

16. "Jane Doe" received this "Badoo" contact from Williams via her cellular telephone. Therefore, the use of "Badoo" and the cellular phone would be in or affecting interstate or foreign commerce. William's profile picture was visible on "Jane Doe's" "Badoo" account on her phone. Via "Badoo," Williams asked "Jane Doe," "Can I come see you, "You smoke", "U like x?", "Wanna chill …my girl don't care."

17. "Jane Doe" and Williams continued to engage in a chat. Williams then asked permission to pick up "Jane Doe" from her current location, to which "Jane Doe" agreed and provided Williams her address in Jefferson County, MO.

18. On or about March 5, 2018, Williams drove his vehicle (a 2009 Gray Dodge Avenger) from St. Louis County, Missouri to "Jane Doe's" residence in Jefferson County, Missouri. Williams picked up "Jane Doe" and drove her back to his residence in unincorporated St. Louis County. Upon arrival at Williams' residence, "Jane Doe" met Williams' fiancé Nashonda Sykes ("Sykes"). Williams then told "Jane Doe" that she would work and "make money."

19. Following, Williams took "Jane Doe" to a street named Dr. Martin Luther King Boulevard in St. Louis. Once there, she exited Williams' vehicle where Williams struck "Jane Doe" with the back of his and hand told her "You'll do whatever I tell

8

you to do." Once outside the vehicle, "Jane Doe" met an unknown male on the street, and she provided him oral sex in exchange for $25. "Jane Doe" only provided oral sex to one person, and returned to Williams' vehicle where she gave Williams the money she earned.

20. Williams then drove "Jane Doe" back to his house where they remained the rest of the night. While there, "Jane Doe" had consensual sexual intercourse with Williams and Sykes, they consumed marijuana and Williams forced "Jane Doe" to take an unknown pill. Additionally, Williams would spontaneously slap and punch "Jane Doe" in the face and she was kicked.

21. The next day, Williams told "Jane Doe" that she was going to do the same thing as the previous night. Following, "Jane Doe," Williams, Sykes and Sykes' children climbed into Williams' vehicle and drove to the area of Dr. Martin Luther King Boulevard in St. Louis, MO. "Jane Doe" exited the vehicle, and Williams' drove off.

22. While on Dr. Martin Luther King Boulevard, "Jane Doe" then met multiple men with whom she engaged in oral sex in exchange for money. "Jane Doe" said she did not remember how many men she provided oral sex to, but she made $97 at the end of the night. Williams and Sykes returned to pick up "Jane Doe" from Dr. Martin Luther King Boulevard, to take her back to Williams' house.

23. While in the vehicle, "Jane Doe" handed the money that she made that night directly to Williams with no attempt to hide it from Sykes, and Sykes did not appear to be surprised that "Jane Doe" was giving Williams money. During that time, Williams thought "Jane Doe" was keeping money from him, and Williams kept smacking "Jane Doe." Williams kept looking for money hidden between "Jane Doe's" phone case and her phone, and as "Jane Doe" sat in the front passenger seat of the vehicle, Sykes sat behind her, holding her hair, preventing "Jane Doe's" escape from the vehicle.

24. "Jane Doe" also reported that Sykes knew that "Jane Doe" was trading sex acts for money, because at one point after Williams had struck "Jane Doe," she was talking to Sykes without Williams present. During that conversation, "Jane Doe" mentioned to Sykes that she wanted Williams to stop hitting her, and Sykes told "Jane Doe," "Well you have to make the money."

25. Your affiant reviewed the March 6th "Badoo" messages between "Jane Doe" and Williams. In the "Badoo" exchange, "Jane Doe" messaged Williams, "On Belt…And m l king…Police hot right here but I got 35…I'm finna keep trying while I'm waiting for you". Williams responded, "Keep trying …U make some shake hoe …how much you got".

9

26. Williams, Sykes and "Jane Doe" arrived back Williams' house in St. Louis County around 1am. At that time, Sykes and Williams believed they heard noises in the attic and that people were trying to break into the house. They blamed "Jane Doe" for this and both began to assault her.

27. "Jane Doe" was struck with open palm strikes, open backhand strikes, and closed fist strikes by both Williams and Sykes. At one point, Williams ordered Sykes to strike "Jane Doe," and Sykes complied with Williams' order. "Jane Doe" placed her arm and hand over her face to block Sykes blows, and "Jane Doe" suffered a significant injury to her wrist and hand.

28. After the assault continued for an unknown amount of time, Williams then walked into the kitchen and removed a "butcher knife." Williams walked over to "Jane Doe," held the knife to her throat, and threatened to cut "Jane Doe's" throat, all the while crafting a story with Sykes that would be told to police in the event they killed "Jane Doe" in Williams' home.

29. Williams then drove around and eventually stopped on a street in an area "with a lot of trucks." While in the vehicle, Williams handed the knife to Sykes and Sykes put the knife against "Jane Doe's" throat and told "Jane Doe" if she told the truth they would let her go. Williams then continued to drive, but eventually stopped and exited the vehicle. Williams told "Jane Doe" to exit the vehicle as well, and then forced "Jane Doe" onto her knees, grabbed the back of her head and pulled downward exposing her neck. Williams then put the knife to "Jane Doe's" face and cut her on the forehead, and then he put the knife against "Jane Doe's" neck, and asked her is if she would say anything to the police. "Jane Doe" said she would not, and Williams got inside his vehicle and drove away with Sykes.

30. During the morning of March 7, 2018, "Jane Doe" walked around the area for a while until she found a business that was open. She walked inside American Medicare Counselors at 1829 Belt Way Drive in Overland, MO and asked someone to call the police.

31. From that Overland location, "Jane Doe" was transported by ambulance to the DePaul Health Center for treatment for cuts, bruises and a broken hand. During this investigation, your affiant observed a small cut on "Jane Doe's" forehead, as well as swelling around her eyes and severely swollen and bloody lips. While at the hospital, "Jane Doe" provided the address where she had been assaulted.

32. That same day, officers with the St. Louis County Police Department located Williams and conducted a traffic stop. Inside Williams' vehicle, **Cell Phone A** was located and seized in plain view from between the driver's seat and center console. Williams was taken into custody and transported to the St. Louis County Police Department Headquarters. Later that evening, Sykes was also located at her

10

residence and taken into custody by members of the St. Louis County Police Department.

33. On March 8, 2018, a federal complaint was filed in the United States District Court, for the Eastern District of Missouri (4:18 MJ 3079 NCC), against Williams and Sykes for violation of Title 18, United States Code §1591, Sex Trafficking by Force, Fraud or Coercion.

34. On March 9, 2018, a federal search warrant was authorized by the Honorable U.S. Magistrate Judge Noelle Collins for Williams' 2009 Gray Dodge Avenger (4:18 MJ 3092 NCC) which authorized investigators to enter seize the vehicle and the contents therein.  The application and affidavit for the federal warrant provided probable cause to believe that evidence of violations of Title 18, United States Code, §1591 (Sex Trafficking by Force, Fraud or Coercion), and  §1952 (Use of Interstate Facilities to Facilitate Prostitution) would be found in the vehicle, as it was used to facilitate the aforementioned violations of federal law.

35. During the execution of the search warrant for Williams' vehicle, a large butcher-style knife was located wedged between the driver's seat and the center console.  The knife appeared to match "Jane Doe's" description of the knife used by Williams and Sykes in the instant offense.  Also located in the rear seat of the vehicle were two long, blonde hairs that are consistent with "Jane Doe's" hair color and style.

36. On April 18, 2018, a Grand Jury sitting in the Eastern District of Missouri indicted the defendants in case No. 4:18CR00326 CDP, on one charge of Sex Trafficking by Force, Fraud or Coercion in violation of Title 18 U.S.C. §1591(a) and 2.

37. Your affiant is aware through training and experience that persons in the sex trafficking industry use cell phones and computers to advertise victims on the internet in order to profit financially from illegal means.

38. Your affiant is aware through training and experience that oftentimes phone correspondence is used between traffickers, victims and potential clients to arrange meetings to exchange sex acts for money.

39. Based on my knowledge, training, and experience, as well as the facts from the present investigation, I also know that the digital media to be searched can contain correspondence and communications between "Jane Doe," Williams and Sykes, as well as pictures/images of locations of activities which occurred.

40. Based on my knowledge, training, and experience, I know that cellular telephones, computers, and digital media devices have the ability to hold phone books and photographs as well as a record of calls made and received.

11

## VIII. CONCLUSION

41. In view of the foregoing, there is probable cause to conclude that, in the digital media to be searched (attached list A) there will be located evidence of a crime, contraband, the fruit or instrumentalities of a crime, of one or more violation of Title 18, United States Code §§1591(a) and 2 (sex trafficking by force, fraud or coercion, and aiding and abetting in the commission of the offense), and §1952 (use of interstate facilities to promote, manage or facilitate prostitution). Accordingly, I respectfully request the issuance of a warrant to search the following digital media for the items on attached list A.

42. In order to prevent the compromise of this on-going investigation, affiant respectfully requests that the application, affidavit and search warrant be sealed.

JARED QUEEN
Task Force Officer
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 11th day of May, 2018.

NANNETTE A. BAKER
United States Magistrate Judge
Eastern District of Missouri

12

## ATTACHMENT A
## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. Cellular telephone(s), cellular telephone hardware, cellular telephone software, cellular telephone related documentation, cellular telephone media, cellular telephone passwords and data security devices, which includes the items listed below:

    (a) Gold Motorola Moto, Cell Phone IMEI: 355674083208499, **"Cell Phone A,"**

2. All data files, including but not limited to graphic representations, containing matter pertaining to human-trafficking/prostitution, that is, visual depictions of females and males posed in sexually-explicit positions or engaging in sexually-explicit conduct; that is, visual depictions of U. S. currency, firearms and people posed with such items.

3. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to human-trafficking/prostitution.

4. Any visual depiction, in any form, containing matter pertaining to human-trafficking/prostitution, which is a visual depiction of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

5. Electronic mail, chat logs, and electronic messages, offering to transmit through interstate or foreign commerce, including by United States mail or by computer, visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

6. All correspondence regarding the possession, distribution, sale or receipt of human-trafficking/prostitution.

7. Any correspondence pertaining to the persuasion, inducement, and/or enticement of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

8. Any and all correspondence offering to transmit through interstate commerce including by United States Mail or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

9. Any and all correspondence identifying persons transmitting, through interstate commerce including by United States Mail or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

1

10. Any and all records and ledgers bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission, through interstate commerce including by United States Mails or by computer, any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

11. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce by United States Mail or by computer, or any information related to human-trafficking and prostitution or any visual depictions of females and males posed in sexually explicit positions or engaging in sexually explicit conduct.

12. All references to paperwork in this list of items to be seized includes records no matter how recorded.

## DEFINITIONS

The following terms have the indicated meaning in this affidavit:

a. Sexually explicit conduct means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person. 18 USC 2256(2).

b. Visual depiction includes undeveloped film and videotape, and data stored electronically which is capable of conversion into a visual image. 18 USC 2256(5).

c. "Cellular Telephone hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, SIM cards, memory cards and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d. "Cellular Telephone software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.

Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

   e. "Cellular Telephone-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use various hardware, software, or other related items.